# IN THE SUPREME COURT OF IOWA

No. 15–2109

Filed November 10, 2016

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**KRISTY BOYER ARZBERGER,**

Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission recommended thirty-day suspension of attorney's license. **LICENSE SUSPENDED.**

Tara van Brederode and Amanda K. Robinson, Des Moines, for complainant.

David L. Brown of Hansen, McClintock & Riley, Des Moines, for respondent.

**APPEL, Justice.**

In this disciplinary case, the Iowa Supreme Court Attorney Disciplinary Board (Board) charged the respondent, Kristy B. Arzberger, with a violation of Iowa Rule of Professional Conduct 32:1.5(a) ("A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses, or violate any restrictions imposed by law."). This case arises from Arzberger charging and collecting extraordinary fees in a probate case without court approval. After a hearing, the commission recommended a thirty-day suspension.

For the reasons expressed below, we conclude that the respondent violated Iowa Rule of Professional Conduct 32:1.5(a). We suspend the respondent's license to practice law for thirty days.

**I. Factual and Procedural Background.**

**A. Factual Background.** Arzberger is a Mason City lawyer licensed to practice law in Iowa. She began practicing law in 1986 and has been in private practice as a solo practioner since 1988. Her practice has included family law, agribusiness matters, real estate, and probate work. Over the years, she has had a commendable record of public service and community activities in the Mason City area, including service on boards of directors of the Crisis Intervention Service, the Red Cross, Mason City Noon Rotary, Girl Scouts of North Iowa; the United Way Allocation Committee; and the foundation board of the North Iowa Area Community College. She has been active in church affairs, has mentored at-risk youth, and has provided pro bono legal work.

Arzberger has a prior history of private admonitions. In 2002, the Board privately admonished her for falsely telling a client that a petition for visitation rights had been forwarded to the sheriff for service. While Arzberger indicated that mistake was made by her secretary, the Board

concluded that Arzberger failed to supervise nonlawyer personnel in connection with their communications with clients. In 2008, the Board privately admonished Arzberger for conduct prejudicial to the administration of justice when, in an appeal of a dissolution-of-marriage case, she ignored a notice of default for want of prosecution.

The matter now before us relates to allegations that Arzberger charged extraordinary fees without court approval in probating the estate of John Nepstad. Although the issue before us is relatively narrow, a full understanding of the factual posture of this case is necessary to resolve this appeal.

Arzberger represented John Nepstad (John) for a number of years and drafted his last will and testament. John died on July 4, 2011. After John's death, Matthew Nepstad (Nepstad), John's son who resides in Minnesota, contacted Arzberger to inquire about her serving as the estate's attorney and probating the estate.

On July 5, Arzberger sent Nepstad a letter outlining the probate process. Arzberger told Nepstad that "[t]he cost of probating the estate is set per Iowa law. For ordinary services the fees are $220 for the first $5000.00 and 2% of the remaining estate." This statement did not track with Iowa Code section 633.198 (2011), which does not *set* ordinary fees but instead provides for a *reasonable fee*, subject to court approval, that ordinarily should not exceed the amount Arzberger quoted.

Arzberger's July 5 letter also addressed the possibility of extraordinary fees. Arzberger stated, "In the event the liquidation of the estate calls for extensive work, for example, selling real estate, an attorney may ask for extra-ordinary fees. These fees must be approved by the Court." Nepstad was appointed the executor of the estate on

July 26. He subsequently retained Arzberger to represent the estate in the probate matter.

A complication in the probate matter soon arose. In the past, John had been in a relationship with Lori Thomas. John's will provided, "If at the time of my death Lori and I are still residing together . . . I give, devise and bequeath my residence to Lori." After John's death, Thomas claimed that she and John were, in fact, living together at the time of John's death, thereby entitling her to John's residence under the express terms of John's will. Further, Thomas claimed entitlement to ongoing support from the estate.

Thomas filed suit on August 29, seeking title to the residence and spousal support. She demanded a jury trial and submitted discovery requests. Arzberger forwarded Thomas's August 29 documents to Nepstad the following day. In an email dated August 30, she informed Nepstad, "This is not a normal probate proceeding. Therefore, *I will be asking the court for extraordinary fees above the statutory fee allowed by law.*" (Emphasis added.)

Arzberger began to prepare for trial on Thomas's claims. On December 20, Thomas served answers to interrogatories on Arzberger, which stated that Arzberger "may be called as a witness" in the litigation. Notwithstanding the receipt of this information, Arzberger continued to work on the Thomas matter in late December 2011 and early 2012, including, among other things, reviewing and drafting of discovery and drafting an outline of the case.

On April 5, 2012, Thomas's counsel raised the issue of whether Arzberger had a conflict of interest in connection with her representation of the estate in the Thomas matter. Arzberger consulted a district court judge, who advised that although a conflict might not be present if her

testimony would be favorable to the estate, it would be advisable to hire other counsel to avoid the potential for a mistrial.[1]

On April 13, 2012, Arzberger applied to the district court for permission to employ additional counsel in order to "avoid the appearance of impropriety" should she have to testify in the Thomas matter. In the application, Arzberger stated that she would "remain as designated attorney for probate of the estate except for defending the estate against the claims of Lori A. Thomas." On the same day, the district court granted the application, directing Nepstad to "immediately retain additional counsel of his choosing to defend the claims of Lori A. Thomas." The order also stated "Arzberger shall remain the designated attorney for the Estate *as to all other probate matters*." (Emphasis added.)

Nepstad, on the advice of Arzberger, retained Colin Murphy to defend the Thomas claim. Murphy was retained in late April, but his bill for the estate indicates he began work twelve days before trial. Arzberger continued to work on the Thomas matter. For example, her billing statement in the Thomas matter indicated that in June of 2012, Arzberger reviewed the file, began compiling discovery responses, drafted witness and exhibit lists, contacted witnesses, generated notes to the file, and drafted subpoenas for witness appearances at trial.

---

[1]While the propriety of Arzberger's continuing representation of the estate with respect to the Thomas matter is not at issue, we note that there is authority indicating that there is an inherent conflict when a lawyer is to testify while serving as an advocate, even if the testimony is favorable to the client. 2 Geoffrey C. Hazard, Jr., et al., *The Law of Lawyering* § 36.02, at 36-3 (4th ed. 2015 Supp.). Ordinarily, a lawyer must withdraw when she is a necessary witness. Iowa R. Prof'l Conduct 32:3.7; *see Comm. on Prof'l Ethics & Conduct v. McCullough*, 465 N.W.2d 878, 882–83 (Iowa 1991). The Iowa Rules of Professional Conduct include three exceptions to this rule. Iowa R. Prof'l Conduct 32:3.7. We come to no conclusion as to whether any of those exceptions existed here or whether Arzberger's presence as cocounsel at trial was proper.

The trial on Thomas's claims occurred on June 27, 2012. Both Arzberger and Murphy attended the trial, with Murphy conducting the examination of witnesses, including Arzberger herself. The day after trial, Nepstad sent an email to Murphy and Arzberger asking for a bill for all work done on the matter through the end of June. In the email, Nepstad stated that he understood that the fees for "the normal estate work is a percentage of the final assets so I don't need that as I already have a good idea of the fees associated with it."

Both Arzberger and Murphy responded to Nepstad's June 28 email on the same day. Arzberger stated, "As to fees related to the litigation . . . we will be working on this and have it out to you [Nepstad and Murphy] both *in an Affidavit format for filing with the Clerk* to which we can add [Murphy's] fees within the week." (Emphasis added.) Murphy responded by stating that he would prepare a total of his time spent preparing for trial and the trial itself. Nepstad requested to be able to review the fee affidavit before it was filed. Arzberger promptly replied that Nepstad was welcome to do so and "[i]nquire as you feel appropriate."

On July 16, the district court entered its ruling in the Thomas matter. In its ruling, the district court stated, "The estate was represented by counsel Kristy B. Arzberger and [Colin] Murphy." The district court further noted that, "Kristy Arzberger was called as a witness on behalf of the estate, therefore, by agreement of the parties, Mr. Murphy acted as counsel of record for the hearing in this matter."

With respect to the substance of the dispute, the district court held that Thomas failed to meet her burden of showing that the parties had a common law marriage or that the parties resided together at the time of

John's death. The district court declined to award attorney fees to the estate. Costs were assessed against Thomas.

On July 17, Arzberger submitted an invoice for fees to Nepstad in connection with the Thomas matter totaling $6325.20. The Arzberger invoice contained itemization for services but no hourly rate. The invoice included fees of $2564.25 incurred after the entry of the April 13 order authorizing the hiring of additional counsel for the estate. It also included a June 27 entry for work labeled "attend trial, testify, and assist in preparation" in the amount of $1316.25. Arzberger stated, "These will be the fees that will be due this office, over and above statutory fees for the normal estate work." On July 23, 2012, Murphy submitted a fee statement to Nepstad totaling $3698.30 at a rate of $150 per hour for legal services.

No application for extraordinary fees in connection with the Thomas matter, however, was filed with the district court. As a result, contrary to Iowa Code section 633.199 and Iowa Court Rule 7.2(3), no district court order approving the extraordinary fees was entered in the Thomas matter.

On July 31, Nepstad sent an email to Arzberger noting that he was "a bit surprised" that the fees for the Thomas matter totaled over $10,000. He asked for an explanation of why it was necessary to hire Murphy, noting "I seem to recall you mentioning a conflict of interest but the details are a little fuzzy." Arzberger responded that same day, noting that she was sorry the cost was what it was but that she charged "only for time spent and trust [Murphy] did the same." Nepstad responded by noting that he was obviously happy with the outcome of the Thomas matter, but questioned whether the potential conflict could have been

identified sooner and wondered why the file was not fully transferred to Murphy once he agreed to take the case.

Arzberger further responded to Nepstad that same day. She stated she could not have anticipated that she would be called as a witness. She further stated that the only real duplication that occurred was on the date of trial, which she characterized as "beneficial to the outcome" of the matter. The next day Arzberger sent another email to Nepstad noting, "I'm a busy attorney with plenty of work. I did NOT take action on this to bleed the estate or you Matt."

Nepstad responded on August 2 by noting that the Arzberger law firm had previously incorrectly asserted that insurance proceeds paid directly to Nepstad would be included in the estate for purposes of calculating the two percent ordinary attorney fee. He also criticized her fee statement as not including an hourly rate for the work—information Nepstad claimed he had previously sought but was not provided.

On September 20, Arzberger emailed Nepstad a lengthy letter responding to his complaints regarding the billing for the Thomas lawsuit. In her September 20 letter, Arzberger justified the amount she was charging the estate in extraordinary fees. She recognized that the time spent in trial between her and Murphy was duplicative, but stated that it was "extremely beneficial" to Nepstad to have Arzberger listening to all the testimony in the courtroom prior to her testimony. She noted that Murphy handled all after-trial issues.

With respect to her invoice for extraordinary fees in the Thomas matter, Arzberger stated in her September 20 letter,

> I will agree to write down . . . my statement in the amount of $500.00 if the entire balance due and owing to both myself and Mr. Murphy is paid in full within 10 days from this date,

as to fees incurred related to the Thomas claim. *Those fees are approved to be paid from the Estate.*

(Emphasis added.)

With respect to the erroneous inclusion of insurance proceeds paid directly to Nepstad in the calculation of size of the estate for purposes of determining ordinary fees, Arzberger stated that her legal assistant was responsible for the misinformation. Arzberger stated, however, that "there has not been an Application for Attorney Fees filed with the Court pertaining to the normal estate proceedings." Arzberger noted that any application for ordinary fees "will need to be signed by you before filing with the Court."

Arzberger's statement regarding the status of any claim for ordinary fees was correct. As of September 20, no application for ordinary fees had been filed. Further, Arzberger correctly noted that any application for ordinary fees would need to be signed by Nepstad as executor before filing with the court.

Arzberger's statement regarding the status of any claim for extraordinary fees in connection with the Thomas matter was incorrect. No claim for extraordinary fees had been filed with the court, let alone approved. And Nepstad, as executor, had not been presented with an application for extraordinary fees for his review and signature.

Nepstad responded the same day to Arzberger's September 20 letter. Nepstad again stated that he did not need two attorneys to represent the estate at the trial on Thomas's claim, that he had not known what Arzberger's hourly rate was, and that he was not timely informed of various developments in the file. Nepstad proposed a reduction of $2179 from Arzberger's invoice totaling $6325.20 for services in the Thomas matter.

In an October 2 email, Arzberger, after reviewing other matters related to the estate, asked for payment of her fees in connection with the Thomas matter. She stated, "If you have not already done so, I ask that you remit payment to Mr. Murphy and myself for the Thomas litigation at this time. I would appreciate payment within the week." On October 5, Nepstad wrote indicating that Murphy had been paid but indicated dissatisfaction with the discount proposed by Arzberger on her bill on the Thomas matter. He asked, "*Do you have a process for escalating this? (i.e. mediation, Iowa judicial board, etc.*)." (Emphasis added.) In the meantime, Nepstad indicated he would send a check for $4146.20—the balance of Arzberger's invoice minus the $2179 that Nepstad contested.

Five days later, Arzberger responded to Nepstad's October 5 email, which sought, among other things, a "process" to resolve the fee dispute. Arzberger responded by noting that she had already discounted her bill on the Thomas matter by "over $1600 of billable time" and that with the additional $500 discount, her billings were more than fair. Arzberger did not advise Nepstad that he had a right to a hearing before the district court on the question of extraordinary fees.

In December, Arzberger and Nepstad engaged in correspondence related to the possibility of bringing a small claims action against Thomas for rent that might be due as a result of her occupying property other than John's residence owned by the estate. On December 3, Arzberger expressed a reluctance to get involved without addressing the unpaid dollar amount "ow[ed] to [her] related to work done by [her] and time spent by [her] pertaining to the litigation filed by [Thomas] . . . ." Arzberger indicated a willingness to be engaged in additional work "if we can get this [issue] addressed this week."

On December 5, Nepstad tersely stated that he would not need Arzberger's assistance with the new matter. Repeating a request from his October 5 email to Arzberger, Nepstad again stated that before he would pay any of the outstanding balance, he wanted a process for resolving the fee dispute. Nepstad wrote, "I will need the opinion of a 3rd party as to if the charges are justified. *Do you have a process for escalating this with clients?* Please let me know how you would like to proceed." (Emphasis added.)

Arzberger responded to Nepstad's December 5 email the same day. She declared that she did not have a process for resolving the fee dispute and that "people in this area know that I have a good reputation, that I do good legal work, that I do only the work necessary, and that I do not cheat clients or overcharge." Arzberger further stated that Nepstad was free to get "a second . . . opinion from someone of your choice."

On December 6, Arzberger sent a letter via email to Nepstad related to ordinary legal fees for the estate. She stated, "Iowa statute provides for statutory attorney fees for the normal processing of an estate. That fee is $220.00 for the first $5000 of assets and 2% for all remaining assets. In this case, the statutory attorney fee is $13667.00."

Arzberger sent Nepstad an "Application for Attorney Fees" and a "Waiver of Notice and Consent to Fees." The application did not include an itemization of fees but simply stated, "Arzberger has served as attorney for the Estate and should be allowed a reasonable fee for ordinary services rendered, together with reimbursement of actual and necessary expenses. That statutory fee for this matter is $13667.00." The "Waiver and Notice and Consent to Fee" stated that Nepstad waived notice of hearing on the "Application" and consented to the entry of an order approving the payment of the fee. No similar set of documents

related to the extraordinary fee in the Thomas matter was sent to Nepstad.

Arzberger's representations and her submission of a liquidated but unitemized fee statement for ordinary estate work were consistent with her initial July 5, 2011 representation to Nepstad that "the cost of probating the estate is set per Iowa law." Nepstad signed the necessary documents, forwarded them to Arzberger, and the application for ordinary fees was approved by the district court on December 20, 2012.

During 2013, Arzberger and Nepstad engaged in correspondence about final steps required to close the estate. The closing of the estate was delayed by confusion over filing of proper tax returns with the state. By the end of the year, all documents and clearances needed to close the estate were obtained, and the estate was closed on January 30, 2014.

After the closing of the estate, Arzberger sent reminders to Nepstad of the outstanding balance related to her invoice for extraordinary fees arising from the Thomas litigation for a period of time, but she did not initiate a suit against him.

**B. Disciplinary Proceedings.**

1. *Nepstad complaint.* Nepstad filed a complaint with the Board in March 2014. His original complaint asserted a number of violations. Nepstad claimed violations of Iowa Rules of Professional Conduct 32:1.4 (communications), 32:1.5 (fees), 32:1.7 (conflict of interest), 32:3.7 (lawyer as a witness), and 32:1.1 (competence).

2. *The Board's complaint and subsequent stipulations.* The Board initiated disciplinary proceedings against Arzberger for violating rule 32:1.5(a). On August 24, 2015, the parties reached a stipulation regarding the facts. In the original stipulation, the parties characterized Arzberger's failure to file the application for extraordinary fees as

"inadvertent." The stipulation further indicated that the Board had no authority to make recommendations regarding whether Arzberger should refund the amount of extraordinary fees paid by Nepstad or reopen the estate to obtain court approval of the fees. On August 25, the commission approved the stipulation, but reserved the right to determine whether to hold a limited hearing "to elicit such additional evidence as the Division may deem necessary to facilitate informed consideration of the complaint."

On October 7, the parties filed an amended and supplemented stipulation. The amended stipulation differed from the initial stipulation in that it did not characterize the failure to file the application for extraordinary fees as "inadvertent." Further, the amended stipulation required that Arzberger either pay back all extraordinary fees obtained from the Nepstad estate or reopen the estate and seek court approval of the fees. The commission accepted the amended stipulation but proceeded with a hearing to clarify the issues.

3. *Hearing before the commission.* The commission hearing consisted of testimony by Nepstad and Arzberger. Nepstad testified by telephone. Nepstad testified that he was never informed of Arzberger's hourly rate, despite repeatedly asking for a fee schedule in emails to her.

Nepstad explained he understood that he would be paying Arzberger for the work she performed preparing for trial of the Thomas matter up until Murphy was hired to represent the estate, and then perhaps some for the transition of the case after that, but he was upset by Arzberger's continuing involvement with the case culminating in her sitting with Murphy at the June 27 trial and assisting in the case. Nepstad explained that he felt like he had to pay two attorneys to do the work of a single attorney. With respect to judicial involvement on the

question of extraordinary fees related to the Thomas matter, Nepstad said he understood that when the court approved extraordinary fees, it would be a "blanket approval" that would then cover any amount Arzberger wished to charge.

Arzberger testified before the commission in person. Arzberger gave an overview of her probate practice. She explained that she typically has three full-time support staff and that one of her support staff, who had been with her for sixteen years, left during the pendency of the Nepstad estate. She estimated that around ten percent or less of her practice has been probate work.

Arzberger testified regarding the emergence of the potential conflict of interest. Arzberger explained that after she received the interrogatory responses from Thomas and a letter from Thomas's lawyer saying that she had a potential conflict of interest, Arzberger researched the issue and concluded there would not be a conflict because any testimony she might give would be favorable to the estate. Arzberger testified that she additionally sought advice from a judge not involved with the case. She testified the judge agreed that she did not need to withdraw, but said it would be a good idea having another attorney involved at the time of trial to eliminate the risk of a mistrial.

Arzberger stated she decided to seek additional counsel to represent the estate in the Thomas matter. Arzberger described how she and Murphy had agreed that Arzberger would actually do everything up until trial and that Murphy's responsibilities would be to split witness preparation with Arzberger and represent the estate at trial. She and Murphy agreed that given the amount of work that Arzberger had already completed on the case and her familiarity with the information and

people involved, it would be beneficial for her to serve as cocounsel at trial.

On business matters, Arzberger testified that her billing rate of $195 an hour was communicated to Nepstad in telephone conversations. Arzberger did state, however, that she had never sent Nepstad an itemized bill for her ordinary fees.

On the issue of the filing of an application for extraordinary fees, Arzberger admitted she made a mistake by not filing the application. Arzberger asserted she had actually prepared and signed an application and that she had truly thought the application had been filed by her paralegal. Arzberger testified she had talked with her paralegal prior to the hearing and that her paralegal's recollection was that the application had been prepared and that the paralegal, too, thought it had been filed with the court.

Even though she said that she thought her paralegal filed the application, Arzberger emphasized she was taking full responsibility for the oversight. Arzberger explained she only became aware that the application for extraordinary fees had not been filed when the Board informed her of that fact on May 21, 2014. Arzberger said that she had never previously had a probate case in which extraordinary fees were involved.

Arzberger was questioned about Nepstad's dispute over the amount of extraordinary fees. Arzberger explained that neither the dispute itself nor Nepstad's repeated request for a "process" to resolve the fee dispute prompted her to check her files for the court approval of extraordinary fees in the Thomas matter.

With respect to a potential remedy, Arzberger was asked if she was prepared to return to Nepstad the unapproved extraordinary fees.

Arzberger said, "I'm prepared to do whatever I have to do to rectify my error." She stated that she felt an appropriate sanction would be a public reprimand and an order to refund the extraordinary fees to Nepstad. When asked why she had not refunded the fees prior to the commission hearing, Arzberger said that her counsel for this matter advised her to wait.

A member of the commission asked if, as Arzberger had testified, the application for extraordinary fees had actually been prepared and Arzberger had signed it, why a copy of the signed but unfiled document had not been submitted to the Board. Arzberger explained that she submitted all the documents she thought were relevant to her counsel, over one hundred and fifty pages of documents, and she thought she was providing everything of relevance. The commission member asked if the document would not then still be in her office as an electronic document that would reveal when the document had been prepared. Arzberger said she had computer issues in her office, and they transitioned from one server provider to another and that some things were lost, so she does not have an electronic file that would show when the document was created.

The commission member observed that if the application had been filed, Nepstad would have needed to review and sign it before filing. Arzberger agreed that Nepstad would have had to have reviewed and signed the application if it had been filed.

Arzberger also testified that she had taken certain remedial steps in light of the complaint. She attended a CLE on probate matters and has changed her form letter to state that Iowa law generally establishes a two percent cap on ordinary estate fees. She also testified regarding her long-time active involvement in community affairs.

4. *Commission's proposed findings of fact and conclusions of law.* The commission came to a unanimous conclusion in its proposed findings of fact, conclusions of law, and recommendations.

First, the commission did not find credible Arzberger's claim that the application for extraordinary fees in the Thomas matter had been prepared and signed, but inadvertently not filed. It described her testimony that she could not produce the draft application because of computer issues as "convenient" and noted that Arzberger failed to call her former paralegal who could testify as to whether the application was prepared. The commission also found it unusual that, despite Arzberger and her staff never having applied for extraordinary fees before, Arzberger relied on her staff to handle the application without oversight.

Second, regarding whether an application had ever been prepared by Arzberger, the commission found Arzberger's claim that she failed to realize she had not filed the application until notified by the Board to be incredible. The commission found Arzberger's response demonstrated "deliberate and willful" disregard of Nepstad's emails questioning the extraordinary fees. The commission found it inexplicable that Arzberger never checked her file to confirm that the application had been filed and the extraordinary fees approved and to furnish this approval to Nepstad to demonstrate the fees were proper.

Third, the commission found that, in light of the court order authorizing the estate to employ additional counsel and designating Arzberger the attorney for "all other probate matters," Arzberger "should not have been doing any work related to defending the estate . . . nor charging any fees for such work, after April 13, 2012."

Fourth, the commission further expressed its frustration that Arzberger told Nepstad that Iowa law *sets* the fees for probate at two

percent, rather than the reality that the fees are *capped* at two percent. The commission pointed to the fact that Arzberger never itemized her time for her ordinary fee work and that she failed to show why the highest fee allowable by law was reasonable under the circumstances. "It is unclear to the Panel how an attorney can charge and collect an extraordinary fee when services for the 'normal' probate work have not yet been completed."

Based on the foregoing, the commission came to the double-barreled conclusion that Arzberger "charged and collected an unreasonable fee and violated restrictions imposed by law" under rule 32:1.5(a). Taking into account the aggravating and mitigating factors, the commission recommended that Arzberger be suspended for thirty days.

**C. Positions of the Parties.** Arzberger does not contest that she violated rule 32:1.5(a). She contends, however, that her failure to apply for extraordinary fees was an honest mistake. She asserts that a public reprimand would be the appropriate sanction in her case. *See, e.g., Comm. on Prof'l Ethics & Conduct v. Elson,* 430 N.W.2d 113, 115 (Iowa 1988) (reprimanding attorney who received fees prior to court approval, but fees were proper); *Comm. on Prof'l Ethics & Conduct v. Winkel,* 415 N.W.2d 601, 603 (Iowa 1987) (reprimanding attorney who collected fees prior to order authorizing the fees). Arzberger argues that suspension of a lawyer's license for violation of probate rules relating to fees is appropriate only when a lawyer engages in dishonest practices.

Arzberger further argues that mitigating factors are present in her case, including a lack of harm to Nepstad, her volunteer community service, the fact that she cooperated with the Board, her taking

responsibility for her actions, and her efforts to ensure that such mistakes do not occur again by implementing new office procedures.

Arzberger argues that we should give little weight to the commission's findings of fact, conclusions of law, and recommendations because they mischaracterize her actions by suggesting that she was dishonestly attempting to collect unearned fees. Arzberger states that she has never attempted to blame her staff for her failure to file the application for extraordinary fees—she stated that her staff did not file the application because that was a relevant fact in explaining how she failed to file the application. She argues that throughout the process she has taken full responsibility for the oversight.

Arzberger also argues that the commission questioned her in detail on matters that were not relevant to the Board's complaint, and these matters distract from the issue. She further argues that both the Board and the commission have flipped the burden of proof, requiring her to prove that she was not dishonest, rather than the Board having to prove that she was.

The Board defends the commission's recommendation of a thirty-day suspension. The Board argues that *Elson* and *Winkel*, cited by Arzberger, are distinguishable from the facts of this case because the prior cases involved attorneys taking ordinary probate fees prior to court approval. It is much easier, the Board contends, to determine whether ordinary probate fees are appropriate given the cap placed on such fees by law, but an extraordinary probate fee is not so capped.

Additionally, the Board stresses that Nepstad actively disputed the appropriateness of the extraordinary fees in the Thomas matter. According to the Board, it is just an assumption that these unapproved extraordinary fees would be otherwise appropriate. In fact, the Board

points out the commission found that the extraordinary fee was excessive given that the court, in its order approving the hiring of additional counsel, had ordered Arzberger to remain the estate's attorney for all other probate matters other than the litigation.

The Board points to *Iowa Supreme Court Board of Professional Ethics & Conduct v. Smith* as the most apposite case. 569 N.W.2d 499 (Iowa 1997). In *Smith,* the attorney took ordinary probate fees early but he also took extraordinary fees that were later determined to be excessive and made misrepresentations—Smith was suspended for thirty days. *Id.* at 500–03. Here, the Board argues Arzberger overcharged extraordinary fees by $2564.25, the amount billed for work on the Thomas suit after the order approving hiring additional counsel for the estate.

The Board also argues that misrepresentation occurred in this case because Arzberger willfully and deliberately disregarded emails from Nepstad in which he expressed concerns about the amount of extraordinary fees and requested third-party assistance, which was available in the form of a judge who would approve extraordinary fees. Arzberger also gave testimony that the commission found not credible. The Board maintains that Arzberger's lack of honesty in her testimony before the commission shows that Arzberger intentionally failed to apply for court approval of extraordinary fees.

## II. Standard of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowe,* 830 N.W.2d 737, 739 (Iowa 2013). An attorney's ethical misconduct must be proved by a convincing preponderance of the evidence. *Id.* "We respectfully consider the commission's findings and recommendations, but are not bound by them." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Englemann,* 840

N.W.2d 156, 158 (Iowa 2013). "If we find a violation, we 'may impose a lesser or greater sanction than the discipline recommended by the grievance commission.'" *Id.* (quoting Iowa Ct. R. 35.11(1), now found at Iowa Ct. R. 36.21(1)).

**III. Discussion.**

**A. Scope of the Proceeding.** We begin by considering the proper scope of this proceeding. As can be seen from the above factual background, a number of potential ethical issues are lurking in this case. The questioning of the commissioners and the briefing filed suggests some confusion on defining the issues that are properly before us.

There are a number of potential issues related to Arzberger's fees for ordinary services to the estate. For example, Arzberger represented to Nepstad that under Iowa law the ordinary fees for probate are *fixed* by statute rather than *capped* by the statute. Her statement that the fees were fixed by statute is reflected in the fact that she did not keep an itemized record of her ordinary fees, apparently believing that such records were not necessary in light of a liquidated statutory fee.

Iowa Code section 633.198, however, provides that an attorney in an estate proceeding may obtain reasonable fees in an amount that ordinarily should not *exceed* $220 for the first $5000 and two percent of any amount over $5000 of the value of the estate. *See* Iowa Code §§ 633.197, .198. Thus, there could be ethical issues related to her misrepresentation of Iowa law to Nepstad on how ordinary fees are calculated. There also could be ethical issues in her representations to the court in her application for ordinary fees as well as separate ethical issues related to her failure to justify the reasonableness of her ordinary fees through an itemized fee statement to the district court. Clearly, the

commission was concerned about this issue when it made its recommended sanction in this case.

With respect to her extraordinary-fee claim, there are several potential violations. First, the failure to obtain court approval of an extraordinary fee would amount to a fee obtained in violation of a restriction imposed by law. *See* Iowa Code § 633.199; Iowa Ct. R. 7.2(3). Second, by participating in the work up of the Thomas matter in which she had reason to believe she would be called as a witness, Arzberger might have acted with a conflict of interest. Iowa R. Prof'l Conduct 32:3.7. Third, the extraordinary fee actually charged, including fees due to the presence of two attorneys at trial, could be unreasonable, which would give rise to a potential ethical violation surrounding the extraordinary fee. Iowa R. Prof'l Conduct 32:1.5. It is clear that the commission was concerned with all three of these issues.

In order to determine the scope of this proceeding, we begin by an examination of the original complaint. The original complaint contained one count that was entitled "Extraordinary Fees in Probate." While the title of the count suggests a limitation of the complaint to extraordinary fees, paragraph 19 of the complaint does note that the extraordinary fees were "[i]n addition to fees of two percent of the estate for standard services related to the probate." Yet, the most reasonable interpretation of the original complaint is that it related solely to the extraordinary fee and not the ordinary fees in this case.

As to violations with respect to extraordinary fees, paragraph 22 of the complaint alleged—after describing the estate's hiring of Murphy to handle the litigation related to the Thomas matter—that "[i]n connection with the foregoing," Arzberger violated "Iowa Rule of Professional Conduct 32:1.5(a) (A lawyer shall not charge or collect an unreasonable fee or

violate any restriction imposed by law.)" Even if the allegation is limited to ethical violations surrounding only the extraordinary fee, the allegation would be broad enough to include violations related not only to failure to obtain prior approval for the extraordinary *but also* violations related to reasonability of the charges.

Any doubt regarding the scope of the proceeding, however, is resolved by the parties' amended stipulation. According to the amended stipulation, the parties agreed that Arzberger violated Iowa Rule of Professional Conduct 32:1.5(a). The amended stipulation states,

> The factual basis for this rule violation is that Respondent failed to file an Application for Approval of Extraordinary Fees before billing for and collecting an extraordinary fee in probate as required by Iowa Code § 633.199 and Iowa Ct. R. 7.2(3).

The factual basis for the alleged violation, notably, does not include anything related to the charging of ordinary fees, nor does it mention anything about the reasonability of the extraordinary fees charged. Thus, the sole violation before the commission was a violation of Iowa Rule of Professional Conduct 32:1.5(a) arising from the failure to obtain court approval for the extraordinary fees.

Even though the charge in the complaint and amended stipulation is narrow, however, the nature of the underlying conduct and facts associated with the underlying conduct may be mitigating or aggravating factors in determining the appropriate sanction. In this case, an important issue is whether the failure to obtain court approval of extraordinary fees was a simple oversight or was there an element of dishonesty or intentional misconduct involved.

**B. Violation of Iowa Rule of Professional Conduct 32:1.5(a).**
Iowa Rule of Professional Conduct 32:1.5(a) reads, in part, "A lawyer

shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses, or violate any restrictions imposed by law." The parties agree that Arzberger violated the rule with respect to "restrictions imposed by law," but do not agree that Arzberger charged an unreasonable fee. Even though the parties agree on part of the violation, we must nonetheless exercise our independent judgment that the record and the law support a conclusion that Arzberger committed an ethical violation. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Deremiah*, 875 N.W.2d 728, 732 (Iowa 2016); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 857 N.W.2d 510, 514 (Iowa 2014).

Iowa Code sections 633.197 and 633.198 set the maximum amount that an attorney may be paid for ordinary probate fees.[2] Section 633.199 allows attorneys to charge for extraordinary services, including, among other things, services related to disputed matters. The statute provides that the court is to determine when such further allowances are "just and reasonable," depending on a number of factors identified in the statute. *Id.* Iowa Court Rule 7.2(3) provides the procedure for obtaining court approval:

> When an allowance for extraordinary expenses or services is sought pursuant to Iowa Code section 633.199, the request shall include a written statement showing the necessity for such expenses or services, the responsibilities assumed, and the amount of extra time or expense involved. In appropriate cases, the statement shall also explain the importance of the matter to the estate and describe the results obtained. The request may be made in the final report or by separate application. It shall be set for hearing upon reasonable notice, specifying the amounts claimed, unless waivers of notice identifying the amounts claimed are filed by all

---

[2]This amount is six percent for the first $1000, four percent for any amount over $1000 to $5000, and two percent on any amount over $5000. Iowa Code §§ 633.197–.198. For estates valued over $5000, this is equal to $220 plus two percent of the amount over $5000.

interested persons. The applicant shall have the burden of proving such allowance should be made.

An attorney's taking of probate fees without proper court authorization constitutes a violation of rule 32:1.5(a). *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 867–68 (Iowa 2010) ("Taking probate fees without prior approval by the court violates rule 32:1.5(a) . . . ."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Evans,* 537 N.W.2d 783, 785 (Iowa 1995) (holding that receiving fees in probate without prior court approval violates the rule against illegal fees); *Comm. on Prof'l Ethics & Conduct v. Coddington*, 360 N.W.2d 823, 824–25 (Iowa 1985) (holding that collecting fees which were later ratified by the court were still improper because "fees in probate matters are to be received only after their authorization by the court").

It is uncontested that Arzberger failed to apply for court approval for the extraordinary fees. The record supports this conclusion. We therefore hold that Arzberger violated rule 32:1.5(a) by collecting fees that violated restrictions imposed by law.

**B. Sanctions.** Having found a violation, we now turn to the question of sanctions. We seek to be consistent in applying sanctions, but also recognize that the discipline imposed must be tailored to the individual facts and circumstances of the given case. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*, 830 N.W.2d 355, 358 (Iowa 2013); *Iowa Supreme Ct. Att'y Discipline Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007).

> In fashioning an appropriate sanction, we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 502 (Iowa 2008); *accord Powell*, 830 N.W.2d at 358; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wheeler*, 824 N.W.2d 505, 511 (Iowa 2012).

Here, there is a question regarding the nature of the violation. If Arzberger intentionally failed to apply for extraordinary fees prior to charging and collecting the fees, this would be a significant aggravating factor. Along similar lines, if Arzberger tried to cover up an inadvertent failure to apply for extraordinary fees by falsely claiming to have prepared and signed the application, the violation would also be aggravated. If, however, Arzberger did not intentionally fail to file and was completely forthright before the commission regarding how she had failed to file the application, the nature of the violation would be less severe.

The Board cites the credibility determinations of the commission in its argument that Arzberger intentionally failed to apply for extraordinary fees. Arzberger, on the other hand, argues that the commission was incorrect when it found her not credible and that we should reverse the commission's credibility findings on our de novo review.

We are, of course, free to disagree with the credibility findings of the commission. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Sobel*, 779 N.W.2d 782, 787 (Iowa 2010); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath*, 713 N.W.2d 682, 702 (Iowa 2006). We do, however, give deference to the commission's credibility findings because the commission is in the best position to make credibility determinations. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ouderkirk*, 845 N.W.2d 31, 33 (Iowa 2014); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 659 (Iowa 2013).

After our independent review of the record, we conclude, as did the Board, that Arzberger must have at some point realized that she did not, in fact, have court approval for the extraordinary fees. Perhaps Arzberger initially thought that she had prepared an application for extraordinary fees, although she did not testify that she recalled seeing an order approving such fees. If Arzberger thought that the extraordinary-fee application in the Thomas matter had been filed and approved by the court, the simple and obvious response to Nepstad's repeated questioning of the extraordinary fees would have been to retrieve the order from the file and send a copy to Nepstad. Further, because Nepstad was objecting to the extraordinary fees, it must have been clear to Arzberger that Nepstad had not approved them.

It is hard to comprehend that Arzberger would not have discovered the lack of a filed application for extraordinary fees and an order approving them after Nepstad's repeated emails disputing the fee and his two explicit attempts to obtain some kind of impartial process for resolving the issue. We thus agree with the commission's alternative finding that Arzberger must have learned that there was no court order approving the fees after Nepstad repeatedly raised the issue.

We also note there is a pattern of mistakes and misrepresentations regarding fees in this case. Arzberger initially misstated the manner in which ordinary fees were to be calculated, claiming that they were set by the Iowa Code. Her paralegal later included proceeds from an insurance policy for purposes of calculating ordinary fees, which Nepstad objected to after conducting his own legal research on the issue. Finally, Arzberger inexplicably did not tell Nepstad that the district court was vested with the power to determine the reasonability of the extraordinary fee and that a forum was, in fact, available to address the dispute.

Arzberger knew that ordinary fees were subject to court approval. She knew that extraordinary fees were subject to court approval. Yet she did not advise Nepstad of the status of the extraordinary-fee approval even under repeated questioning. We thus conclude that the acts and circumstances suggest more than a simple inadvertent mistake on the part of Arzberger.

Having determined that the nature of the violation was more than a mere failure to seek court approval, we examine the sanctions imposed in similar cases in order to determine the appropriate range of sanctions. *See Lickiss*, 786 N.W.2d at 868–69 (examining prior cases to establish the parameters of appropriate sanctions). Generally speaking, when an attorney collects illegal or excessive fees with respect to a probate proceeding, the disciplines imposed range from reprimands to suspensions of varying lengths. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carty*, 738 N.W.2d 622, 624 (Iowa 2007).

Our caselaw shows that if an attorney violates probate rules by taking an early fee to which she is otherwise entitled, later obtains a court order authorizing the fee, and causes no other harm to the client, we may issue a public reprimand. *See Elson*, 430 N.W.2d at 115; *Winkel*, 415 N.W.2d at 602–03. If, however, an attorney charges an excessive fee or engages in misrepresentation, we may suspend the attorney. *See Carty*, 738 N.W.2d at 625; *Smith*, 569 N.W.2d at 501, 503; *Evans*, 537 N.W.2d at 785–86. If an attorney completely fails to apply for attorney fees, harms their client, and severely neglects client matters, we may impose a longer suspension. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Fleming*, 602 N.W.2d 340, 342–43 (Iowa 1999).

We note that the element of misrepresentation is present in Arzberger's conduct here, not only in her misrepresentations to the

commission, but in her misrepresentations to her client regarding both ordinary and the extraordinary probate fees. Yet, there are mitigating factors. Specifically, Arzberger has a commendable record of volunteer community service. She has also instituted new office procedures to prevent recurrence of any similar future errors in probate proceedings.

We must balance the aggravating and mitigating factors. Taking into account these factors, we conclude that a thirty-day suspension is the most appropriate discipline to impose in this case.

When ethical violations cause harm to clients, we have required proof of restitution as a condition for reinstatement. *Carty*, 738 N.W.2d at 625 (ordering restitution of amount attorney collected in excess of the maximum authorized by law in a probate case); *see also Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Jay*, 606 N.W.2d 1, 4 (Iowa 2000); *Fleming*, 602 N.W.2d at 342–43; *Comm. on Prof'l Ethics & Conduct v. Johnson*, 404 N.W.2d 184, 186 (Iowa 1987). The amended stipulation suggested that Arzberger would either refund $4146.20 to Nepstad or reopen the estate to seek court approval of her extraordinary fees. At the hearing before the commission, Arzberger stated that she would refund $4146.20 to Nepstad. We take her up on that suggestion and incorporate it in our sanction.

### IV. Conclusion.

For the above reasons, we suspend Arzberger's license to practice law for thirty days. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 34.23(3). Arzberger must comply with Iowa Court Rule 34.24 dealing with the notification of clients and counsel. Arzberger is required to make restitution as provided by this opinion, and no automatic reinstatement, as provided under Iowa Court Rule 34.23(2),

will be ordered until all restitution has been made.  Costs for this action are taxed to Arzberger pursuant to Iowa Court Rule 36.24.

**LICENSE SUSPENDED.**

All justices concur except Wiggins, J., who concurs in part and dissents in part.

#15–2109, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Arzberger*

**WIGGINS, Justice (concurring in part and dissenting in part).**

I agree with the part of the majority decision finding a violation of our rules. However, I dissent as to the sanction for not using the objective criteria of the ABA's *Standards for Imposing Lawyer Sanctions* (1992). *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morse*, ____ N.W.2d ____, ____ (Iowa 2016) (Wiggins, J., concurring in part and dissenting in part).